UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ERIC DARCELL WALKER, JR.,

Plaintiff,

v. Case No. 24-cv-472-pp

BRANDON KAPOLNEK
and SASHA JOHNSON,

Defendants.

---

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 41), DENYING PLAINTIFF'S MOTION TO DEEM PROPOSED FINDINGS OF FACT UNDISPUTED (DKT. NO. 62) AND DENYING PLAINTIFF'S MOTION TO STRIKE DECLARATION (DKT. NO. 63)**

---

Plaintiff Eric Darcell Walker, Jr., who is incarcerated at Stanley Correctional Institution and is representing himself, filed a complaint under 42 U.S.C. §1983 alleging that the defendants, Milwaukee County Sheriff's Department Officers Sasha Johnson and Brandon Kapolnek, violated his constitutional rights when he was a pretrial detainee confined at the Milwaukee County Jail. The court screened the complaint and allowed the plaintiff to proceed on Fourteenth Amendment failure-to-protect claims based on allegations that the plaintiff told the defendants that his cellmate had threatened to harm him, but they did not take action before his cellmate attacked him (including biting off part of the plaintiff's finger). Dkt. No. 18 at 5-6. This order addresses the defendants' motion for summary judgment, dkt. no. 41, the plaintiff's motion to deem his proposed findings of fact undisputed, dkt. no. 62, and the plaintiff's motion to strike the declarations of John Dingman, dkt. no. 63.

## I. Facts[1]

On September 19, 2023, the plaintiff was booked into the Milwaukee County Jail as a pretrial detainee. Dkt. No. 43 at ¶1. Five days earlier, James Baggett was booked into the jail and was assigned to a general population housing unit. Id. at ¶2. Before the incident with the plaintiff, Baggett did not receive any jail rule violations and was not the subject of any jail investigations. Id. at ¶3. On September 19, 2023, defendants Sasha Johnson and Brandon Kapolnek worked at the jail as corrections officers, assigned to the third floor—floor control to conduct inspections of Pods 3A, 3B and 3C. Id. at ¶¶4, 6. A third officer, Tiffany Tatum (not a defendant) also was assigned to the third floor—floor control that day, where she was responsible for answering incarcerated individuals' intercom calls. Id. at ¶¶5, 6.

Jail healthcare staff medically screen individuals when they enter the jail, which includes asking questions about medical and mental health history. Id. at ¶¶7-8. After the medical screening, jail staff assigned to the classification unit determine cell assignments. Id. at ¶9. Classification unit officers also conduct cell assignment changes for incarcerated individuals when necessary. Id. at ¶10. When making housing decisions, classification unit staff members review criminal charges, prior incarceration records, behavioral risk factors and requirements for separation from other individuals. Id. at ¶12. Corrections officers can submit requests to the classification unit, but the classification unit must process all cell assignments and changes. Id. at ¶14. Lieutenants or higher-level staff can determine that an incarcerated individual is a danger to himself or others and can call classification directly to request a move for safety

[1] The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c).

purposes. Id. at ¶15. The defendants and Tatum did not have any role in the classification of incarcerated individuals or the determination of specific cell assignments in September of 2023. Id. at ¶¶16-17.

The plaintiff arrived at the jail on September 19, 2023 around 11:00 a.m., at which time he was in the booking area for various screenings by jail and medical staff. Id. at ¶19. Classification staff assigned the plaintiff to general population housing—Pod 3B, Cell 8—where James Baggett already was housed. Id. at ¶21. General population is a housing classification for incarcerated individuals who do not require special housing accommodation and can safely be housed with others. Id. at ¶22. Pod 3B, Cell 8 is a double cell, which means it has a bunkbed. Id. at ¶23. Every cell in Pod 3B has an intercom call button affixed to a wall inside the cell for incarcerated individuals to use when they need to speak with jail staff. Id. at ¶24. Jail officials informed the plaintiff that the "emergency call button" in his cell was for emergencies only. Dkt. No. 52-1 at ¶31.

Before Kapolnek arrived at his floor control assignment, he was assigned to Pod 3B until about 6:00 p.m., at which time he began locking the incarcerated individuals in their cells. Dkt. No. 43 at ¶26. Kapolnek completed locking in Pod 3B at 6:11 p.m., and the plaintiff did not arrive to Pod 3B prior to this time. Id. at ¶27. At 6:42 p.m., Kapolnek conducted an inspection of Pod 3B and saw Baggett laying quietly under his blanket on his bunk. Id. at ¶28.

The plaintiff voiced complaints about Baggett within the first ten to fifteen minutes of his arrival at his cell. Id. at ¶29. The first recorded complaint was a call the plaintiff made from his cell's emergency call button at 6:48 p.m. and answered by Tatum, but the plaintiff says that he spoke with Johnson via the emergency call button before that.

It is undisputed that Johnson spoke with the plaintiff before the incident that occurred between the plaintiff and Baggett. Dkt. No. 52-1 at 3 ¶8. The parties dispute whether the plaintiff spoke with Johnson when he pressed the emergency call button in his cell or in person at his cell door. According to the plaintiff, the first officer he spoke with from the emergency call button was Johnson. Dkt. No. 53 at ¶29; Dkt. No. 52-1 at 3 ¶7. The plaintiff says that he pressed the emergency call button to inform officers that Baggett had threatened him. Dkt. No. 52-1 at 7 ¶2. Johnson responded that they "were grown" and would have to "work it out" themselves.[2] Id. According to the defendants, at some point before Kapolnek spoke with the plaintiff in person at 7:12 p.m., Johnson spoke with the plaintiff in person, at which time the plaintiff said he thought his cellmate was "weird," but did not say that he feared for his safety or give any other indication that his safety was threatened. Dkt. No. 43 at ¶46. The plaintiff states that he spoke to Johnson via the emergency call button, but that he did not speak to her in person. Dkt. No. 53 at ¶46. The plaintiff states that the evidence shows Johnson did not do an inspection or rounds on Unit 3B until 7:50 p.m., which was after the incident, so he could not have spoken with her in person.[3] Id.

[2] The plaintiff requested that Johnson make a written and sworn statement that she never answered the emergency call button on September 19, 2023. Dkt. No. 52-1 at 5 ¶24. The plaintiff requested all video and audio relevant to the incident. Id. at ¶25. The defense did not deliver any audio containing the conversation between the plaintiff and Johnson. Id. at ¶26.

[3] The plaintiff states that records show that Johnson never physically entered Pod 3B before the incident between himself and his cellmate. Dkt. No. 52-1 at 2 ¶9. He cites to a document titled Transaction Doors Report that shows a door "Reader entry" for Pod 3B on September 19, 2023. Id. The defendants filed a supplemental declaration which states that although jail staff use electronic key cards to document their assigned inspection rounds, staff use physical

According to the defendants, Tatum answered the first call the plaintiff made from his cell. Dkt. No. 43 at ¶29. It is undisputed that at 6:48 p.m., the plaintiff pressed his emergency call button, spoke with Tatum and stated, among other things, "either y'all finna move me out of this cell, rotate me out of this cell, somewhere where I can be comfortable, or I'mma tear this bitch up. That's all I'm saying . . . I'm not really bothered with him. I ain't get along with him. I ain't gunna lie to you Miss Lady, and it ain't no, it ain't no way we can fix this. I just feel how I feel and like I don't, I don't—I'm not comfortable, and I really ain't comfortable. And I ain't trying to start nothing with nobody. I ain't trying to harm nobody." Id. Tatum asked the plaintiff open-ended questions in an effort to understand his concerns, but the plaintiff continued to state things such as that his cellmate was "weird" and that he was "not comfortable"; he did not state that he feared for his safety or that he had been threatened. Id. at ¶30. Tatum said that she would call "Classification" but that simply complaining about feeling uncomfortable was likely not enough for a cell change. Id. at ¶32.

Tatum promptly called the classification department and told an officer that the individuals in Pod 3B, Cell 8 were not getting along and that the plaintiff had asked to be moved. Id. at ¶33. The classification officer told Tatum that the plaintiff and Baggett needed to give it some time. Id. at ¶34.

At 6:51 p.m., three minutes after the first call with Tatum, the plaintiff pressed his intercom button and spoke with an unidentified male officer who told him that it was not possible to move cells at that time and tried to diffuse the situation by giving the plaintiff coping mechanisms for dealing with his

keys to unlock and access secure area of the jail, including Pod 3B, which does not result in a digital record being created. Dkt. No. 59 at ¶9.

cellmate. Id. at ¶35. During the call, the plaintiff yelled and appeared to say, "someone come get me out of this cell . . . or I'm gonna get killed in this bitch[.]" Dkt. No. 51, Exh. I at 00:17-00:28. The plaintiff told the officer that he felt threatened. Dkt. No. 52-1 at 4 ¶19.

Six minutes later, at 6:57 p.m., the plaintiff pressed his emergency call button again and spoke with Tatum, who told him that the classification officer had said that the plaintiff and Baggett needed some time together to work through their issues and that he could not be moved at that moment. Dkt. No. 43 at ¶36. Tatum gave the plaintiff suggestions to help pass the time and to avoid his cellmate, but the plaintiff became increasingly agitated and the call was terminated. Id. at ¶37. During this call, the plaintiff started by asking quietly, multiple times, to be removed from the cell and eventually yelled, "come take me to the hole." Dkt. No. 51, Exh. J at 00:01-00:44.

At 7:03 p.m., about five minutes after the previous call ended, the plaintiff again pressed his intercom call and asked Tatum if staff were going to "come grab [him]." Dkt. No. 43 at ¶39. Tatum explained to the plaintiff that his cellmate had no complaints or reported issues before the plaintiff entered the cell and asked if the plaintiff was simply trying to obtain a cell without a cellmate, to which the plaintiff eventually stated that he had met someone in booking with whom he got along and suggested he be moved to Cell 18. Id. at ¶40. It is not uncommon for incarcerated individuals to voice complaints about their cellmates. Id. at ¶41. During this call, the plaintiff stated, "He keep mumbling . . . I'm (unintelligible) from punching him in his motherfucking mouth bro," to which Tatum asked what his cellmate was mumbling and if he was saying he would hurt the plaintiff. Id. at ¶42. The plaintiff did not answer Tatum's question and instead said, "I have real issues . . . And now, I wanna

fight. I don't like people like that and that's all I'm saying. I don't know this guy, he don't know me. And that's all I'm saying. I feel like, I'm trying my best to be humane. That's all I'm saying folks. I'm fighting real demons folks and I'm trying my best not to take my anger out on nobody. That's all I'm saying." Id. at ¶43. During this intercom call, the plaintiff did not relay any of the threats Baggett allegedly had made to him because he did not want to be perceived by Baggett as being weak, so he displayed courage instead. Id. at ¶44. Tatum reiterated to the plaintiff that he needed to give the classification department time to operate. Id. at ¶45. Because of the plaintiff's aggressive demeanor, Tatum asked Kapolnek to check on Cell 8 beyond the typical thirty-minute inspections he was conducting. Id. at ¶38.

At 7:12 p.m., Kapolnek conducted an inspection of Pod 3B during which he spoke with the plaintiff, and the plaintiff asked him to move the plaintiff out of his cell. Dkt. No. 43 at ¶49. The parties dispute whether the plaintiff told Kapolnek that Baggett had threatened him. According to the defendants, the plaintiff did not tell Kapolnek that he had been threatened, feared for his safety or felt unsafe. Id. at ¶50. It appeared to Kapolnek that the plaintiff was trying to handpick his cellmate. Id. at ¶51. Kapolnek observed Baggett laying quietly on his bunk. Id. at ¶52. If Kapolnek had any reason to believe that the plaintiff's safety was at risk, he would have alerted his supervisor immediately, which, given Baggett's calm and quiet demeanor, he did not do. Id. at ¶53. According to the plaintiff, he told Kapolnek that Baggett threatened him. Dkt. No. 52-1 at 2 ¶11. The plaintiff asked Kapolnek to place him (the plaintiff) in restrictive housing. Id. at 5 ¶28.

It is undisputed that Kapolnek told the plaintiff that he would see what he could do about the plaintiff's request to move cells, and that he intended to

call the classification department once he completed his pod inspections over the next thirty minutes. Dkt. No. 43 at ¶54. Kapolnek told Tatum and other floor control colleagues about Baggett's calm and quiet demeanor, and that he did not observe Baggett causing any disturbance. Id. at ¶55.

At 7:17 p.m., Tatum spoke with one of her supervisors to relay the plaintiff's complaints and the classification department's response regarding the plaintiff's request to move cells. Id. at ¶56. After informing her supervisor that she believed that the plaintiff was trying to bully his cellmate in an attempt to change his cell assignment, Tatum was advised to continue to listen and if the situation escalated, to report that the plaintiff was disruptive so that he could be removed from the cell. Id. at ¶57.

According to the defendants, the plaintiff did not describe to any corrections officer any of the threats that he alleges Baggett made. Id. at ¶58. The defendants state that as a result of the plaintiff's failure to identify any threat to his safety and Baggett's calm and quiet demeanor, Johnson, Kapolnek and Tatum did not perceive the plaintiff to be at any risk of suffering harm because his cellmate was not displaying any type of behavior that could be considered dangerous or threatening. Id. at ¶59. Tatum and Johnson perceived the plaintiff to be the one who was agitated and who was raising his voice and threatening to act out. Id. at ¶60. None of the officers heard Baggett make any threats to the plaintiff. Id. at ¶62.

The plaintiff states that he informed at least two correctional officers that Baggett had threatened to fight him, that he did not feel comfortable with Baggett and that he did not want to remain in a cell with him. Dkt. No. 51-2 at 2 ¶¶1-2; Dkt. No. 53 at ¶¶58-59. It is undisputed that the plaintiff repeatedly tried to be removed from the cell and said that he would be willing to go to

restrictive housing. Dkt. No. 52-1 at 3 ¶16. The plaintiff tried to reach officers several times over the emergency call button. Id. at ¶17. No officer questioned Baggett to determine the conditions inside the cell. Id. at 6 ¶33.

At 7:24:28 p.m., an incarcerated person in the cell next to the plaintiff pressed his intercom button and reported to Tatum that the individual next to him (the plaintiff) just had his finger bit off. Dkt. No. 43 at ¶63. About twelve minutes after Kapolnek first spoke with the plaintiff, Tatum directed him to immediately report to Pod 3B, Cell 8 to ensure that there were no issues with the plaintiff and Baggett. Id. at ¶¶64-65. After directing Kapolnek to report to Cell 8, Tatum pressed the intercom button to listen to what was occurring inside Cell 8; there were no words spoken, but an unidentified male can be heard screaming. Id. at ¶66.

When Kapolnek arrived at the cell, he saw the plaintiff and Baggett fighting. Id. at ¶67. Kapolnek used his radio to report the fight and request additional staff to assist with the disturbance. Id. at ¶68. About thirty seconds after arriving on the pod, and counter to his training, Kapolnek unlocked the plaintiff's cell door and removed the plaintiff from the cell because it appeared to Kapolnek that Baggett was choking the plaintiff. Id. at ¶70. Kapolnek secured the plaintiff against the wall while Baggett remained inside the cell; no backup officers were present. Id. at ¶71. Jail staff are trained never to intervene alone in a physical altercation between two or more incarcerated individuals; instead, they are trained to call for assistance and wait for additional officers to arrive before intervening. Id. at ¶72. Entering Cell 8 alone while Baggett and the plaintiff were inside the cell fighting each other violated jail policy. Id. at ¶73.

Less than one minute later, four officers arrived at the scene, and two officers assumed control of the plaintiff. Id. at ¶74. Within seconds, more officers arrived and secured Baggett. Id. at ¶75. Baggett was escorted to disciplinary housing and the incident was referred to the Milwaukee County District Attorney's office to pursue criminal battery charges against him. Id. at ¶76. Corrections staff assisted the plaintiff to his feet and escorted him to the floor control area where medical professionals determined that the plaintiff needed to be transported to a nearby hospital for treatment of his severed fingertip. Id. at ¶¶77-78. At about 7:37 p.m., the plaintiff was escorted to an awaiting ambulance for transport to the hospital. Id. at ¶79.

## II. Analysis

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B. Discussion

The defendants contend that the plaintiff cannot show they violated his constitutional rights because the plaintiff did not share with jail staff any specific information to put a reasonable officer on notice that Baggett posed a substantial risk to the plaintiff's safety or well-being. Dkt. No. 42 at 5-10. They also argue that because the plaintiff instigated the fight with Baggett, the defendants may not be held liable for the plaintiff's misconduct. Id. at 10-13. The defendants assert that jail staff took objectively reasonable measures to assure the plaintiff's safety. Id. at 13-14. Finally, the defendants argue that they are entitled to qualified immunity. Id. at 14-15.

The plaintiff responds that factual disputes preclude summary judgment for the defendants. Dkt. No. 52 at 1. According to the plaintiff, he told at least two officers that "he had been threatened or felt threatened by his cellmate." Id. at 5. He states that he spoke with Johnson over the "emergency call button" in his cell, which was "a clear indication that an emergency was at hand," and that he told Johnson that he did not feel comfortable remaining in the cell because Baggett had threatened him. Id. at 6. The plaintiff says that Johnson responded, "yall are grown men" and to "work it out" themselves. Id. The plaintiff also states that when Kapolnek came to his cell, he informed Kapolnek that Baggett had threatened him, but Kapolnek did not alert a supervisor, tell

his colleagues or question Baggett. Id. at 7-8. The plaintiff asserts that he told Kapolnek that he would be willing to go to restrictive housing to get out of the cell. Id. at 8. The plaintiff states that a reasonable person would believe that the plaintiff's reaction was one of "defense and frustration." Id. at 16.

The defendants filed a reply in which they contend that the undisputed facts prevent the plaintiff from showing that either defendant made any decisions with respect to his conditions of confinement on September 19, 2023, that any condition of his confinement placed him at a substantial risk of suffering serious harm, that either defendant failed to act reasonably to abate any risk to the plaintiff's safety or that the defendants caused the plaintiff's injuries. Dkt. No. 58 at 3. The defendants state that neither defendant was responsible for the plaintiff's classification or housing assignment. Id. They contend that the conditions of the plaintiff's confinement did not place him at a substantial risk of suffering serious harm because Baggett's history did not give rise to any specific concerns that he would act violently. Id. at 4. The defendants contend that each defendant acted reasonably to abate any purported risk to the plaintiff's safety. Id. at 4-5. They also contend that the plaintiff is responsible for his own injuries because the undisputed evidence shows that he was the aggressor. Id. at 5.

"[T]he Constitution confers a right on anyone incarcerated to be free from physical harm inflicted by others in the institution." Echols v. Johnson, 105 F.4th 973, 977 (7th Cir. 2024). For pretrial detainees, like the plaintiff, the right comes from the Fourteenth Amendment's Due Process Clause. Id. (citing Kemp v. Fulton County, 27 F.4th 491, 495 (7th Cir. 2022)). To prevail on a due process-based failure-to-protect claim, a plaintiff must show that

> (1) the defendant made an intentional decision regarding the conditions of the plaintiff's confinement; (2) those conditions put the

> plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate the risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved, making the consequences of the defendant's inaction obvious; and (4) the defendant, by not taking such measures, caused the plaintiff's injuries.

Id. at 978 (quoting Kemp, 39 F.4th at 841).

Based on the plaintiff's version of the events, Johnson answered the plaintiff's first emergency call from his cell, and he told her that Baggett had threatened him. Johnson responded that the plaintiff and Baggett "were grown men" and would have to "work it out" themselves. After that call, the plaintiff used his emergency call button four more times. Tatum answered three of the calls, and an unidentified male officer answered one. In all the calls, the plaintiff asked to be moved from his cell. In the call to the male officer, the plaintiff said that Baggett threatened him. In other calls, he said that Baggett was weird and made him uncomfortable. The plaintiff begged to be removed from the cell and said he would go to the "hole" rather than remain in the cell. After the first call Tatum answered, she called the classification unit about the situation. After the third call Tatum answered, she asked Kapolnek to check on the plaintiff and Baggett. Kapolnek stopped at the cell during his rounds and the plaintiff says he told Kapolnek that Baggett had threatened him and that he wanted to be moved out of the cell. The plaintiff says that he again said that he would go to restrictive housing rather than remain in the cell. While Kapolnek was at the cell, he saw Baggett quietly lying on his bed. Kapolnek told the plaintiff that he would contact classification about the plaintiff's request after he completed his rounds. At 7:17 p.m., about five minutes after Kapolnek had spoken to the plaintiff at his cell, Tatum called her supervisor regarding the plaintiff's request to move cells. She said that the cellmates were

not getting along and that the plaintiff may be bullying Baggett. Seven minutes later, at 7:24 p.m., Tatum received a call from the cell next to the plaintiff's reporting that someone's finger had been bitten off.

A reasonable factfinder could conclude that the defendants made an intentional decision regarding the conditions of the plaintiff's confinement, satisfying the first element of a failure-to-protect claim. See Starks v. Dart, Case No. 24 C 9509, 2025 WL 2838956, at *3 (N.D. Ill. Oct. 7, 2025) (citing Clark v. Cook C'nty Sheriff's Off., Case No. 19 C 7131, 2023 WL 4134808, at *3 (N.D. Ill. June 20, 2023) (finding the plaintiff sufficiently alleged an intentional decision where he alleged that the defendant officer failed to prevent an attack on the plaintiff)). The plaintiff also can satisfy the second prong, making a showing that the conditions put him at a substantial risk of serious harm. There is no doubt that the plaintiff suffered serious harm by having part of his finger bitten off. See Brown v. Budz, 398 F.3d 904, 910 (7th Cir. 2005) ("[A] beating suffered at the hands of a fellow detainee . . . clearly constitutes serious harm[.]").

The third element requires that the plaintiff show that the defendants "[were] on notice of a serious of harm" to the plaintiff. Thomas v. Dart, 39 F.4th 835, 841-42 (7th Cir. 2022) (citing Kemp, 27 F.4th at 497). Under the Fourteenth Amendment, a pretrial detainee need only show that an officer's actions were objectively unreasonable. Echols, 105 F.4th at 978 (citing Kemp, 27 F.4th at 495). "[A] defendant officer need not subjectively perceive[ ] the risk of harm particular actions or conditions of confinement present[s] to a plaintiff detainee." Id. (citing Kemp, 27 F.4th at 497); see also Kingsley v. Hendrickson, 576 U.S. 389, 395-97 (2015). The risk a reasonable officer would appreciate

must be somehow "specific to a detainee, and not a mere general risk of violence." Thomas, 39 F.4th at 843 (quoting Brown, 398 F.3d at 909).

Regarding Johnson, not only does the plaintiff aver that he told her Baggett threatened him, the plaintiff avers that Johnson answered the plaintiff's call from his cell's emergency call button, "a clear indication that an emergency was at hand." Velez v. Johnson, 395 F.3d 732, 736 (7th Cir. 2005) (officer knowingly disregarded warnings that a serious harm could occur when, despite vague nature of incarcerated individual's complaints, officer answered call from emergency call button, officer had no reason to doubt there was an emergency, incarcerated individual said he was having a conflict with his cellmate and officer had been instructed to personally respond to emergencies).

The defendants deny that the plaintiff told them Baggett threatened him. According to the defendants, the plaintiff said only that Baggett was acting weird and that the plaintiff felt uncomfortable. Based on the plaintiff's version of the events, the defendants "would have appreciated the high degree of risk the detainee was facing." Thomas, 39 F.4th at 841 (citing Kemp, 27 F.4th at 496); see also Gevas v. McLaughlin, 798 F.3d 475, 480 (7th Cir. 2015) (specific threats from another incarcerated individual are sufficient to alert officers to a substantial risk of harm); cf. Kemp, 27 F.4th at 497 (affirming summary judgment in part because "Kemp admitted that he never reported his verbal disagreement with [the other detainees] or the ensuing threats to jail employees, and that prior to the beating, all four men had cohabited peacefully for months").

Although the defendants did not work in the classification department and did not have the authority to assign the plaintiff to a new cell, they could have contacted the classification department or a supervisor about the

plaintiff's alleged complaints that Baggett threatened him. Tatum contacted the classification department and her supervisor about the plaintiff's calls, but the defendants say that the plaintiff did not specifically say to Tatum that Baggett threatened him, so Tatum did not report that alleged information. It is possible that if the classification department or a supervisor had known that Baggett had threatened the plaintiff, the plaintiff would have been removed from the cell. Johnson responded to the plaintiff that he and Baggett were grown men and should resolve their differences themselves. Kapolnek did not take any action when he talked to the plaintiff at his cell and the plaintiff allegedly said Baggett threatened him and asked to be moved out of the cell, even to restrictive housing.

The defendants contend that a reasonable jury could conclude that the plaintiff instigated the fight with Baggett. Dkt. No. 42 at 12. They state that based on the plaintiff's comments to Tatum over the intercom and prison staff seeing Baggett lying in his bed, no reasonable jury could conclude that the plaintiff's cellmate was the aggressor. Id. But a reasonable jury also could conclude that Baggett had threatened the plaintiff and then started a fight with him after Kapolnek left the cell door. See Dkt. No. 52-1 at 7-8 ¶¶1-4 (Plaintiff's First Affidavit describing Baggett's threats and attack). A reasonable factfinder could conclude that the defendants failed to take reasonable measures to abate the risk to the plaintiff and that their failure caused the plaintiff's injuries. The plaintiff has satisfied the third and fourth elements of a failure-to-protect claim.

Based on the plaintiff's version of the events, a reasonable factfinder could conclude that the defendants failed to prevent Baggett from harming the plaintiff in violation of the plaintiff's rights under the Fourteenth Amendment.

The defendants contend that they are entitled to qualified immunity. Qualified immunity "protects government officials from suit for damages when their conduct does not violate clearly established statutory or constitutional rights." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Determining whether a state official is entitled to qualified immunity involves two inquiries: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." Williams v. City of Chicago, 733 F.3d 749, 758 (7th Cir. 2013). If either inquiry can be answered in the negative, the official is entitled to summary judgment.

A constitutional right is clearly established if "the right in question [is] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Lindell v. Pollard, 558 F. Supp. 3d 734, 744 (E.D. Wis. 2021) (quoting Weinmann v. McClone, 787 F.3d 444, 450 (7th Cir. 2015). "[T]he clearly established right must be defined with specificity." Id. (citing City of Escondido v. Emmons, 586 U.S. 38, 42 (2019)). The court should "analyze whether precedent squarely governs the facts at issue, mindful that [courts] cannot define clearly established law at too high a level of generality." Id. at 744-45 (quoting Strand v. Minchuk, 910 F.3d 909, 917 (7th Cir. 2018)).

The defendants contend that they are entitled to qualified immunity because the undisputed facts show that they did not violate the plaintiff's Fourteenth Amendment right to be protected from attack by another incarcerated individual. Dkt. No. 42 at 15. They assert that the plaintiff did not convey any specific threat he claims Baggett made against him, that the plaintiff was the aggressor and that the defendants and jail staff took reasonable measures to assure the plaintiff's safety. Id. Contrary to the

defendants' assertions, factual disputes preclude summary judgment in their favor. A reasonable factfinder could believe the plaintiff's version of events and conclude that the plaintiff *did* tell the defendants that Baggett threatened him, that Baggett attacked the plaintiff and that the defendants failed to take reasonable measures to protect the plaintiff.

Assuming that a reasonable officer would have been on notice of a threat from Baggett, the question is whether the defendants' inaction violated the plaintiff's clearly established rights. See Balsewicz v. Pawlyk, 963 F.3d 650, 657 (7th Cir. 2020) (addressing qualified immunity in context of Eighth Amendment failure-to-protect claim). Before the alleged assault occurred in September 2023, the Seventh Circuit clearly had established a duty to protect pretrial detainees from serious harm by others in custody. See Terrell v. Cook County, Case No. 25 CV 6641, 2026 WL 146017, at *4 (N.D. Ill. Jan. 20, 2026) (citing Fisher v. Lovejoy, 414 F.3d 659, 661 (7th Cir. 2005) ("The Due Process Clause of the Fourteenth Amendment . . . places a duty upon jail officials to protect pre-trial detainees from violence."); Brown, 398 F.3d at 910–11 (7th Cir. 2005) (noting that pretrial detainee's failure to protect claim arises under the Fourteenth Amendment's Due Process Clause); Weiss v. Cooley, 230 F.3d 1027, 1032 (7th Cir. 2000) (same)). A reasonable officer would have known that failing to act after the plaintiff reported his cellmate had threatened him violated the plaintiff's constitutional rights. See Balsewicz, 963 F.3d at 658 (competent officer would have known that taking no protective action in response to being informed that incarcerated individual faced ongoing excessive danger from other incarcerated individual violated first incarcerated individual's right to be reasonably protected from a violent beating). The

defendants are not entitled to qualified immunity. The court will deny the defendants' motion for summary judgment.

### III. Plaintiff's Motions to Deem Proposed Findings of Fact Undisputed (Dkt. No. 62) and to Strike Declaration of John Dingman (Dkt. No. 63)

The plaintiff has filed a motion asking the court to deem his proposed findings of fact undisputed because the defendants' response does not clearly "dispute" his facts but only admits, denies or objects to his facts. Dkt. No. 62. The plaintiff appears to think that the defendants were required to say "dispute" in their response to his proposed findings of fact to effectively dispute the facts. The rules do not require this. See Federal Rule of Civil Procedure 56(c); Civil Local Rule 56(b)(3)(B). The defendants complied with the applicable procedural rules by providing "a response to each paragraph, including, in the case of any disagreement, specific references to . . . parts of the record." Civil L.R. 56(b)(2)(B)(i). The court will deny the plaintiff's motion to deem his proposed findings of fact undisputed.

The plaintiff also has filed a motion to strike the declarations of John Dingman, in which he states that Dingman cannot respond to the plaintiff's declarations because Dingman is not a party. Dkt. No. 63. Id. The defendants respond that Dingman's declarations are admissible evidence. Dkt. No. 64 at 1. Dingman, a corrections lieutenant at the jail, submitted two declarations regarding his personal knowledge and review of jail records. Dkt. Nos. 48, 60. Dingman's declarations are admissible evidence properly before the court. See Federal Rule of Evidence 803(6)(B), 803(8)(A)(i); see also Fed. R. Civ. P. 56(c)(4). There is no requirement that Dingman (or anyone else) be a party to submit a declaration. The court will deny the plaintiff's motion to strike.

## IV. Conclusion

The court **DENIES** the defendants' motion for summary judgment. Dkt. No. 41.

The court **DENIES** the plaintiff's motion to deem plaintiff's proposed findings of fact undisputed. Dkt. No. 62.

The court **DENIES** the plaintiff's motion to strike declarations of John Dingman. Dkt. No. 63.

The court **ORDERS** that the parties must appear for a telephone status conference on **September 28, 2026 at 11:00 AM** to discuss the next steps in the case. The parties must appear by calling the court's conference line at 551-285-1373 and entering Meeting ID 161 4901 8989 and Passcode 190021 when prompted. The court has arranged with Stanley Correctional Institution for the plaintiff's appearance at the hearing.

Dated in Milwaukee, Wisconsin this 21st day of August, 2026.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**